FOX TELEVISION STATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

National Association of Broadcasters,
et al., Intervenors.

Nos. 00–1222, 00–1263, 00–1326, 00–
1359, 00–1381 and 01–1136.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 7, 2001.

Decided Feb. 19, 2002.

Edward W. Warren and Paul T. Cappuccio argued the cause for petitioners. With them on the joint briefs were Bruce D. Sokler, Richard A. Cordray, Ashley C. Parrish, Ellen S. Agress, Diane Zipursky, Michael D. Fricklas, Mark C. Morril, John G. Roberts, Jr., Stuart W. Gold, Laurence H. Tribe, Jonathan S. Massey, Arthur H. Harding, R. Bruce Beckner and Henk Brands. Jay Lefkowitz entered an appearance.

C. Grey Pash, Jr., Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Jane E. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, James M. Carr, Lisa S. Gelb and Rodger D. Citron, Counsel, Mark B. Stern and Jacob M. Lewis, Attorneys, U.S. Department of Justice. Christopher J. Wright, General Counsel, Federal Communications Commission, Robert B. Nicholson and Robert J. Wiggers, Attorneys, U.S. Department of Justice, entered appearances.

Robert A. Long, Jr. argued the cause for intervenors National Association of Broadcasters and the Network Affiliated Stations Alliance. With him on the brief was Jack N. Goodman.

Harold J. Feld, Andrew J. Schwartzman and Cheryl A. Leanza were on the brief for intervenors/amici curiae Consumer Federation of America and United Church of Christ, Office of Communication, Inc. Wade H. Hargrove, Jr. entered an appearance.

Before: GINSBURG, Chief Judge, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge GINSBURG.

GINSBURG, Chief Judge:

## Table of Contents

| | | Page |
|---|---|---|
| Introduction | | 1033 |
| I. | Background | 1033 |
| | A. The National Television Station Ownership (NTSO) Rule | 1034 |
| | B. The Cable/Broadcasting Cross–Ownership (CBCO) Rule | 1035 |
| | C. Applying § 202(h) | 1035 |
| | 1. The NTSO Rule | 1036 |
| | 2. The CBCO Rule | 1036 |
| II. | Threshold Issues | 1037 |
| | A. Finality | 1037 |
| | B. Reviewability | 1038 |
| | C. Ripeness | 1039 |
| | D. Exhaustion and Standing | 1040 |
| III. | The NTSO Rule | 1040 |
| | A. Section 202(h) and the APA | 1040 |
| | 1. Is the Rule irrational? | 1040 |
| | 2. Failure to comply with § 202(h) | 1044 |
| | 3. Failure to address the *1984 Report* | 1044 |
| | B. The First Amendment | 1045 |
| | C. Remedy | 1047 |
| IV. | The CBCO Rule | 1049 |

Page
A. Section 202(h) and the APA .......................................... 1049
 1. Competition .................................................. 1050
 2. Diversity .................................................... 1051
B. Remedy ................................................................ 1052

V. Conclusion ................................................................ 1053

Before the court are five consolidated petitions to review and one appeal from the Federal Communications Commission's 1998 decision not to repeal or to modify the national television station ownership rule, 47 C.F.R. § 73.3555(e), and the cable/broadcast cross-ownership rule, 47 C.F.R. § 76.501(a). Petitioners challenge the decision as a violation of both the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, and § 202(h) of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56. They also contend that both rules violate the First Amendment to the Constitution of the United States. The network petitioners — Fox Television Stations, Inc., National Broadcasting Company, Inc., Viacom Inc., and CBS Broadcasting Inc. — address the national television ownership rule, while petitioner Time Warner Entertainment Company, L.P. addresses the cable/broadcast cross-ownership rule. The National Association of Broadcasters (NAB), the Network Affiliated Stations Alliance (NASA), the Consumer Federation of America (CFA), and the United Church of Christ, Office of Communications, Inc. (UCC) have intervened and filed briefs in support of the Commission's decision to retain the national television station ownership rule.

We conclude that the Commission's decision to retain the rules was arbitrary and capricious and contrary to law. We remand the national television station ownership rule to the Commission for further consideration, and we vacate the cable/broadcast cross-ownership rule because we think it unlikely the Commission will be able on remand to justify retaining it.

## I. Background

In the Telecommunications Act of 1996 the Congress set in motion a process to deregulate the structure of the broadcast and cable television industries. The Act itself repealed the statutes prohibiting telephone/cable and cable/broadcast cross-ownership, 1996 Act §§ 302(b)(1), 202(i), and overrode the few remaining regulatory limits upon cable/network cross-ownership, *id.* § 202(f)(1). In radio it eliminated the national and relaxed the local restrictions upon ownership, *id.* § 202(a), (b), and eased the "dual network" rule, *id.* § 202(e). In addition, the Act directed the Commission to eliminate the cap upon the number of television stations any one entity may own, *id.* § 202(c)(1)(A), and to increase to 35 from 25 the maximum percentage of American households a single broadcaster may reach, *id.* § 202(c)(1)(B).

Finally, and most important to this case, in § 202(h) of the Act, the Congress instructed the Commission, in order to continue the process of deregulation, to review each of the Commission's ownership rules every two years:

> The Commission shall review its rules adopted pursuant to this section and all of its ownership rules biennially as part of its regulatory reform review under section 11 of the Communications Act of 1934 and shall determine whether any of such rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify

any regulation it determines to be no longer in the public interest.

The Commission first undertook a review of its ownership rules pursuant to this mandate in 1998. This case arises out of the resulting decision not to repeal or to modify two Commission rules: the national television station ownership rule and the cable/broadcast cross-ownership rule.

## A. The National Television Station Ownership (NTSO) Rule

The NTSO Rule prohibits any entity from controlling television stations the combined potential audience reach of which exceeds 35% of the television households in the United States.* As originally promulgated in the early 1940s, the Rule prohibited common ownership of more than three television stations; that number was later increased to seven. *Amendment of Multiple Ownership Rules,* Report & Order, 100 F.C.C.2d 17, ¶¶ 14, 16, 1984 WL 251222 (1984) (*1984 Report*). The stated purpose of the seven-station rule was "to promote diversification of ownership in order to maximize diversification of program and service viewpoints" and "to prevent any undue concentration of economic power." *Id.* ¶ 17.

In 1984 the Commission considered the effects of technological changes in the mass media, *id.* ¶ 4, and repealed the NTSO Rule subject to a six-year transition period during which the ownership limit was raised to 12 stations. *Id.* ¶¶ 108–112. The Commission determined that repeal of the NTSO Rule would not adversely affect either the diversity of viewpoints available on the airwaves or competition among broadcasters. It concluded that diversity should be a concern only at the local level, as to which the NTSO Rule was irrelevant, *id.* ¶¶ 31–32, and that "[l]ooking at the national level [the Rule was unnecessary because] the U.S. enjoys an abundance of independently owned mass media outlets," *id.* ¶ 43. The Commission also concluded that group owners were not likely to impose upon their stations a "monolithic" point of view. *Id.* ¶¶ 52–54, 61. With respect to economic competition, the Commission considered the markets for national and for local spot advertising and concluded that neither would be made less competitive by repeal of the NTSO Rule. *Id.* ¶¶ 66–71.

Implementation of the *1984 Report* was subsequently blocked by the Congress. *See* Second Supplemental Appropriations Act, Pub.L. No. 98–396, § 304, 98 Stat. 1369, 1423 (1984). The Commission thereupon reconsidered the matter and prohibited common ownership (1) of stations that in the aggregate reached more than 25% of the national television audience, and (2) of more than 12 stations regardless of their combined audience reach. *Amendment of Multiple Ownership Rules,* Mem. Op. & Order, 100 F.C.C.2d 74, ¶¶ 36–40, 1985 WL 260060 (1984). These limitations remained in place until 1996, when the Congress (in § 202(c)(1) of the Act) directed the Commission to eliminate the 12–station rule and to raise to 35% the cap upon audience reach, both of which actions the Commission promptly took. *Implementation of Sections 202(c)(1) and 202(e) of the Telecommunications Act of 1996 (National Broadcast Television Owner-*

---

* "No license for a commercial TV broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors, directly or indirectly, owning, operating or controlling, or having a cognizable interest in TV stations which have an aggregate national audience reach exceeding thirty-five (35) percent." 47 C.F.R. § 73.3555(e).

*ship and Dual Network Operations)*, 61 Fed.Reg. 10,691 (Mar. 15, 1996).

### B. The Cable/Broadcast Cross–Ownership (CBCO) Rule

The CBCO Rule prohibits a cable television system from carrying the signal of any television broadcast station if the system owns a broadcast station in the same local market.* In conjunction with certain "must-carry" requirements, 47 U.S.C. §§ 534–535; 47 C.F.R. § 76.55 *et seq.*, to which cable operators are subject, *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 630–32, 114 S.Ct. 2445, 2452–54, 129 L.Ed.2d 497 (1994) (*Turner I*), the Rule has the effect of prohibiting common ownership of a broadcast station and a cable television system in the same local market.

The Commission first promulgated the CBCO Rule in 1970 along with a rule banning network ownership of cable systems. *Amendment of Part 74, Subpart K, of the Commission's Rules and Regulations Relative to Community Antenna Television Systems*, Second Report & Order, 23 F.C.C.2d 816, ¶¶ 11, 15, 1970 WL 17616 (1970). In 1984 the Congress codified the CBCO Rule but not the network ownership ban. Cable Communications Policy Act of 1984, Pub.L. No. 98–549, § 2, 98 Stat. 2779.

In 1992 the Commission repealed the rule prohibiting network ownership of cable systems. *Amendment of Part 76, Subpart J, Section 76.501 of the Commission's Rules and Regulations*, Report & Order, 7 F.C.C.R. 6156, ¶ 10, 1992 WL 690505 (1992) (*1992 Report*). The Commission also revisited the CBCO Rule and conclud-

ed that "the rationale for an absolute prohibition on broadcast-cable cross-ownership is no longer valid in light of the ongoing changes in the video marketplace." *Id.* ¶ 17. Because the Congress had imposed a similar prohibition by statute, however, the Commission did not repeal the Rule; instead, the Commission recommended that the Congress repeal the statutory prohibition. *Id.* In the 1996 Act the Congress did just that without, however, requiring the Commission to repeal the CBCO Rule. 1996 Act § 202(i).

### C. Applying § 202(h)

As mentioned above, the 1996 Act, in addition to raising the national ownership cap to 35% and repealing the statutory ban upon cable/broadcast cross-ownership, required the Commission biennially to review all its ownership rules in order to determine whether they remain "necessary in the public interest." To begin the first review thus called for in § 202(h), the Commission, on March 13, 1998, issued a Notice of Inquiry seeking comments on all ownership rules, including specifically both the NTSO and the CBCO Rules. *1998 Biennial Regulatory Review*, Notice of Inquiry, 13 F.C.C.R. 11276, ¶¶ 14, 43, 1998 WL 110187 (1998). The Commission described as follows the approach it intended to take:

> We solicit comment on our broadcast ownership rules to determine whether these rules are no longer in the public interest as we have traditionally defined it in terms of our competition and diversity goals. Once this phase is completed, we will review the comments and issue a report. In the event we con-

---

* "No cable television system (including all parties under common control) shall carry the signal of any television broadcast station if such system directly or indirectly owns, operates, controls, or has an interest in a TV broadcast station whose predicted Grade B contour, computed in accordance with § 73.684 of part 73 of this chapter, overlaps in whole or in part the service area of such system (i.e., the area within which the system is serving subscribers)." 47 C.F.R. § 76.501(a).

clude there is good reason to believe that any of the rules within the scope of the review, or portions thereof, should be repealed or modified, we will issue the appropriate Notice(s) of Proposed Rule Making.

*Id.* ¶ 3.

Reply comments were filed in June, 1998 but as of the fall of 1999 the Commission had not yet completed its review. Therefore, in November, 1999 the Congress directed that: "Within 180 days ... [the] Commission shall complete the first biennial review required by section 202(h) of the Telecommunications Act of 1996." Consolidated Appropriations Act, 2000, Pub. L. No. 106–113, § 5003, 113 Stat. 1501, 1501A–593 (1999). The accompanying Conference Report instructed: "[I]f the Commission concludes that it should retain any of these rules under the review unchanged the Commission shall issue a report that includes a full justification of the basis for so finding." H.R. CONF. REP. No. 106–464, at 148 (1999).

On May 26, 2000 the Commission announced its decision (by a 3–2 vote) to retain the NTSO and CBCO Rules, among others, and to repeal or to modify certain other of its ownership rules. A few weeks later the Commission issued a written report in which it explained its actions. *1998 Biennial Regulatory Review,* Biennial Review Report, 15 F.C.C.R. 11058, 2000 WL 791562 (2000) (*1998 Report*).

### 1. The NTSO Rule

The Commission gave three primary reasons for retaining the NTSO Rule: (1) to observe the effects of recent changes to the rules governing local ownership of television stations; (2) to observe the effects of the increase in the national ownership cap to 35%; and (3) to preserve the power of affiliates in bargaining with their networks and thereby allow the affiliates to serve their local communities better. *Id.* ¶ ¶ 25–30. The Commission also stated that it believed repealing the rule would "increase concentration in the national advertising market" — presumably to the detriment of competition — and "enlarge the potential for monopsony power in the program production market" — presumably to the detriment of both competition and diversity. *Id.* ¶ 26 n. 78. Commissioners Furchtgott–Roth and Powell dissented. *Id.* at 74; *id.* at 94.

The effect upon petitioners Fox and Viacom of the Commission's decision to retain the NTSO Rule was direct and immediate. Viacom's acquisition of CBS brought its audience reach to 41%; only a stay issued by this court has enabled Viacom to avoid divesting itself of enough stations to come within the 35% cap. *Fox Television Stations, Inc. v. FCC,* No. 00–1222 at 2 (April 6, 2001). Similarly, the Rule is preventing Fox from going forward with its purchase of Chris–Craft Industries, which purchase would enable Fox to reach more than 40% of the national audience.

### 2. The CBCO Rule

In the *1998 Report* the Commission decided that retaining the CBCO Rule was necessary to prevent cable operators from favoring their own stations and from discriminating against stations owned by others. *1998 Report* ¶ 104 ("current carriage and channel position rules prevent some of the discrimination problems, but not all of them"). The Commission also determined that the CBCO Rule was "necessary to further [the] goal of diversity at the local level." *Id.* ¶ 106. The Rule, according to the Commission, contributes to the diversity of viewpoints in local markets by preserving the voices of independent broadcast stations, which provide local news and public affairs programming. *Id.* ¶ ¶ 106–108. Commissioners Furchtgott–Roth and

Powell dissented from the retention of this Rule as well. *Id.* at 74; *id.* at 100.

The effect upon Time Warner of the Commission's decision to retain the CBCO Rule was significant. Although Time Warner has not identified any specific transaction it would have consummated but for the CBCO Rule, the Rule is preventing it from acquiring television stations in markets, such as New York City, where it owns a cable system. Time Warner asserts that "obvious procompetitive efficiencies" would result from "combining" a television station in that area with its all-local-news cable programming service, NY1. Time Warner also argues that the CBCO Rule hinders its "WB" network from competing with networks that own stations in major television markets.

## II. Threshold Issues

Before turning to the merits of the petitions we must consider several threshold issues. The Commission, supported by the intervenors, contends that its decision not to repeal or to modify the Rules is not final agency action, was not meant by the Congress to be subject to review, and in any event is not ripe for review. Intervenors NAB and NASA also argue that the petitioners failed to exhaust their administrative remedies and lack standing.

### A. Finality

■ This court has jurisdiction to review "final orders" of the Commission and "final agency action for which there is no other adequate remedy in a court." 28 U.S.C. § 2342(1); 5 U.S.C. § 704. Consequently, the court must determine whether the Commission's determination was "final." Agency action is final if: (1) it is "the consummation of the agency's decisionmaking process," and (2) "rights or obligations have been determined" by the action or "legal consequences will flow"

from it. *Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct. 1154, 1168–69, 137 L.Ed.2d 281 (1997). The Commission argues that its retention decision does not meet this test; the networks and Time Warner argue persuasively to the contrary.

■ There is no question a Commission determination not to repeal or to modify a rule, after giving notice of and receiving comment upon a proposal to do so, is a final agency action subject to judicial review. *Montana v. Clark*, 749 F.2d 740, 744 (D.C.Cir.1984). Equally clear, an agency's denial of a petition to initiate a rulemaking for the repeal or modification of a rule is a final agency action subject to judicial review. *Capital Network Sys., Inc. v. FCC*, 3 F.3d 1526, 1530 (D.C.Cir. 1993). The question presented here is whether the Commission's determination not to repeal the NTSO and CBCO Rules, made pursuant to § 202(h) after issuing a "Notice of Inquiry" and receiving comment, is likewise a final agency action subject to judicial review.

The Commission first appears to contend that only a decision made pursuant to an adjudicative or rulemaking proceeding is final. The Commission fails, however, either to offer support for this argument or to acknowledge that we have held other types of agency actions to be final and reviewable. *See, e.g., Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435–37 (1986) (holding letter expressing EPA's position on procedural question was final agency action because it was definitive and had direct and immediate effect upon petitioners); *Nat'l Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 702 (1971) (holding letter from Administrator of Wage and Hour Division of Department of Labor interpreting provision of Fair Labor Standards Act was final agency action).

Second, the Commission argues that the *1998 Report* is not final because the agency

intends to continue considering the ownership rules. That, however, does not mean the determination is not "final" as a matter of law. The *1998 Report* is the Commission's last word on whether, as of 1998, the Rules were still "necessary in the public interest as the result of competition."

■ Finally, the Commission says the *1998 Report* does not impose an obligation or deny a right because the petitioners would receive no immediate relief if they were to prevail in their present challenge; all they could get would be an order requiring the Commission to initiate a rulemaking. We shall have more to say below about the relief to which the petitioners are entitled. For now it is sufficient to observe that by the Commission's own account its decision is, in effect, at the least a decision not to initiate a rulemaking, and it is established that "an agency's refusal to institute [rulemaking] proceedings has sufficient legal consequence to meet the second criterion of the finality doctrine." *Capital Network Sys.*, 3 F.3d at 1530. Therefore we conclude, as we must, that the decision under review — holding that the NTSO and CBCO Rules were necessary in the public interest — is a final agency action.

## B. Reviewability

■ Separate from the question whether the 1998 decision is a final agency action, the Commission argues that the "Congress did not intend for the Commission's biennial reviews ... to create reviewable action." In support of this proposition, the Commission notes that § 202(c)(2) of the 1996 Act calls for the Commission to conduct a rulemaking to determine whether to retain, to modify, or to eliminate local television ownership limitations; in contrast, § 202(h) requires only that the Commission "review" rules to determine whether to repeal or to modify

them. The Commission next argues that under the 1996 Act a "determination," unlike a rulemaking decision, is not a reviewable event. It contends that if the Congress had wanted to subject to judicial scrutiny determinations made pursuant to the biennial reviews required by § 202(h), then it would have said so, as it said in § 252(e)(6) of the Act that a state commission's "determination" approving or disapproving an interconnection agreement shall be reviewable in federal court. Additionally, the Commission observes that § 202(h) does not require it to submit a written report to the Congress. All this, according to the agency, indicates the Congress did not intend that the courts review agency determinations made pursuant to § 202(h). In any event, the Commission argues, under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court must defer to the Commission's statutory interpretation to that effect. Finally, the Commission contends that if its every decision to retain a rule under § 202(h) were subject to judicial review, then the agency and the courts alike would face tasks so overwhelming as not to be a result sensibly ascribed to the Congress.

■ In light of the presumption that final agency action is reviewable, *see Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511–12, 18 L.Ed.2d 681 (1967), we must reject the Commission's argument that the text and structure of the 1996 Act preclude judicial review. The contrasts the Commission draws between § 202(c) and § 202(h), and between § 252 and § 202(h), fall short of the "clear and convincing evidence" of congressional intent needed to foreclose review under *Abbott Labs.*, 387 U.S. at 141, 87 S.Ct. at 1511. Nor is an agency's interpretation of a statutory provision defining the jurisdic-

tion of the court entitled to our deference under *Chevron. Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650, 110 S.Ct. 1384, 1391, 108 L.Ed.2d 585 (1990). We appreciate that § 202(h) requires the Commission to undertake a significant task in a relatively short time, but we do not see how subjecting the result to judicial review makes the Commission's responsibility significantly more burdensome, let alone so formidable as to be improbable. In sum, having held that the 1998 decision is a final agency action, we see nothing in the 1996 Act that forecloses judicial review thereof.

## C. Ripeness

■ Next the Commission contends that its decision not to repeal or to modify the ownership rules in question is not ripe for review because the issues are not "fit" for judicial review, and delay would not cause the petitioners any hardship. *See Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. at 1515–16. First, the Commission points out that it is in a better position than the court to determine whether the challenged rules are necessary in the public interest. Second, the Commission argues that the petitioners will not be harmed if the *1998 Report* is not subject to review because they can seek relief from the operation of the rules in other ways — a petition for a rulemaking or a request for a waiver; and again, the relief available to the petitioners would be, in any event, only an order directing the Commission to conduct a rulemaking to consider modification or repeal of the challenged rules. In addition, intervenors CFA and UCC contend that the decision is not ripe for judicial review because they "and other interested parties have not yet had an opportunity to present responsive arguments relating [to the] rules here at issue."

We find these arguments unpersuasive. First, the issues in this case are fit for judicial review because the questions presented are purely legal ones: whether the Commission's determination was arbitrary and capricious or contrary to law, and whether the challenged rules violate the First Amendment. Because the court will not review de novo the Commission's decision to retain the Rules, the Commission's argument that it is in the better position to make that determination is, while doubtless true, quite beside the point.

Second, the petitioners will indeed be harmed if we do not review the Commission's decision now. Although they could challenge the Rules by other means, retention of the Rules in the interim significantly harms both the networks and Time Warner. As we have said, the NTSO Rule constrains Fox and Viacom from entering into or completing certain specific transactions, and the CBCO Rule prevents Time Warner from acquiring television stations in certain markets where it would like to do so. Moreover, the Commission is mistaken in asserting that the only remedy available to the petitioners is a remand for rulemaking. For the reasons we provide below (in Part III.C), we think that under § 202(h) a reviewing court may vacate the underlying rule if it determines not only that the Commission failed to justify retention of the rule but that it is unlikely the Commission will be able to do so on remand.

Finally, CFA, UCC, and all other interested parties were invited in the Notice of Inquiry to comment specifically upon whether the broadcast ownership rules should be retained. *1998 Biennial Regulatory Review*, Notice of Inquiry, 13 F.C.C.R. 11276, ¶ 3 (1998). Perhaps CFA and UCC, unlike the other intervenors and many members of the public, chose not to comment in anticipation of doing so if the Commission were later to propose repealing the Rules. Be that as it may, we do

not see how that can make unripe an otherwise ripe issue or deprive those harmed of their right to timely review of a final agency action. Hence, we conclude the Commission's decision is ripe for review.

## D. Exhaustion and Standing

Intervenors NAB and NASA argue that the petitioners failed to exhaust their administrative remedies because they neither petitioned for a rulemaking to amend or repeal the Rules nor asked the Commission for a waiver of the Rules. They argue that in *Tribune Co. v. FCC*, 133 F.3d 61, 69 (1998), this court "made clear that the exhaustion requirement applies to challenges launched against the ownership rules that are subject to the Commission's biennial review process." The intervenors' reliance upon the *Tribune* case is misplaced, however. When that case was decided the Commission had not yet completed a review pursuant to § 202(h). In this case, where the Commission had just determined that the rules in question were still necessary in the public interest, it obviously would have been futile for the petitioners to have petitioned the agency for a rulemaking to repeal them. And the intervenors cite no authority suggesting the petitioners were required to request a waiver from the agency even though a waiver is not the relief they seek from the court; nor do the intervenors proffer any reason to believe the petitioners would have been entitled to a waiver had they sought one.

The intervenors also argue that the petitioners lack standing because a favorable decision in this case would not redress their injuries. Their point is that the Commission would still have to consider in a rulemaking whether to repeal the Rules, but as we have just seen in connection with the Commission's objection that this case is not ripe for review, that is not

so. We therefore conclude that the petitioners have standing to bring their claims before the court.

## III. The NTSO Rule

Having found no obstacle to our adjudication of this dispute, we turn at last to the merits. The networks assert that the Commission's decision to retain the NTSO Rule was contrary to § 202(h) and arbitrary and capricious in violation of the APA; alternatively they contend the Rule violates the First Amendment.

## A. Section 202(h) and the APA

The networks argue that the Commission's decision not to repeal the NTSO Rule was arbitrary and capricious and contrary to § 202(h) for three reasons: (1) the Rule is fundamentally irrational, and the Commission's justifications for retaining it are correlatively flawed; (2) the Commission failed meaningfully to consider whether the Rule was "necessary" in the public interest; and (3) the Commission failed to explain why it departed from its previous position that the Rule should be repealed.

### 1. Is the Rule irrational?

The networks advance three reasons for thinking that retention of the NTSO Rule was irrational: The 35% cap is if anything less justified than the aggregate limitation upon cable system ownership we held a violation of the First Amendment in *Time Warner Entertainment Co., L.P. v. FCC*, 240 F.3d 1126 (2001) (*Time Warner II*); the Commission has provided no persuasive reason to believe retention of the Rule is necessary in the public interest; and retention of the Rule is inconsistent with some of the Commission's other recent decisions.

*Time Warner II.* According to the networks, "[t]he logic of *Time Warner II* applies with even greater force here."

They contend that the television station ownership cap of 35% is more severe than the cable system ownership cap of 30% struck down in *Time Warner II*, because unlike cable systems "broadcasters face intense competition from numerous stations in each local market" and the 35% cap is measured in terms of homes potentially rather than actually served. In response, the Commission, supported by intervenors NAB and NASA, notes two distinctions between *Time Warner II* and this case: The 30% cap in *Time Warner II* was set by the Commission whereas the 35% cap at issue here was set by the Congress; and the provision of the Cable Act at issue in the prior case limited the extent to which the Commission could regulate in furtherance of diversity, whereas § 202(h) mandates that a rule necessary "in the public interest" — including the public interest in diversity — be retained.

 The networks are right, of course, that a broadcaster faces more local competition than does a cable system. We must also acknowledge that under the cap expressed in terms of a "potential audience reach" of 35%, an owner of television stations cannot in practice achieve an audience share that approaches 35% of the national audience. Nonetheless, we find the networks' reliance upon *Time Warner II* less than convincing for two reasons, one advanced by the Commission and one not. As the Commission points out, we concluded in *Time Warner II* that the 1992 Cable Act limited the agency's authority to impose regulations solely in order to further diversity in programming, *Time Warner II*, 240 F.3d at 1135–36, whereas no such limitation is at work in this case. *See* page 18 below. Additionally, in *Time Warner II* we reviewed the challenged regulations under first amendment "intermediate scrutiny," which is

more demanding than the arbitrary and capricious standard of the APA. *See Time Warner II*, 240 F.3d at 1130 ("a government regulation subject to intermediate scrutiny will be upheld if it 'advances important government interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests'") (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189, 117 S.Ct. 1174, 1186, 137 L.Ed.2d 369 (1997)). In sum, although *Time Warner II* does give the court a point of reference, it is not controlling here.

 *The Commission's reasons: competition, diversity, et al.* The networks next argue that neither safeguarding competition nor promoting diversity generally can support the Commission's decision to retain the NTSO Rule. They then take on the specific reasons given by the Commission in support of its 1998 decision.

As to competition, the networks note that there is no evidence "that broadcasters have undue market power," such as to dampen competition, in any relevant market. The Commission attempts to rebut the point, but to no avail. In its brief the agency cites a single, barely relevant study by Phillip A. Beutel et al., entitled *Broadcast Television Networks and Affiliates: Economic Conditions and Relationship—1980 and Today* (1995). Insofar as there is any point of tangency between that study and the matter at hand, it is in the authors' conclusion that "the available evidence tends to refute the proposition that affiliates have gained negotiating power since ... 1980." *Id.* at 12. The study plainly does not, however, suggest that broadcasters have undue market power. The only other evidence to which the Commission points is a table said to show that "many group owners have acquired additional stations and increased their au-

dience reach since the Telecom Act's passage." *1998 Report* ¶ 27. As the networks point out, however, "such figures alone, without some tangible evidence of an adverse effect on the market, are insufficient to support retention of the Cap." Finally, the Commission's reference in the *1998 Report* to the national advertising and the program production markets is wholly unsupported and undeveloped. *1998 Report* ¶ 26 n.78. Consequently, we must conclude, as the networks maintain, that the Commission has no valid reason to think the NTSO Rule is necessary to safeguard competition.

As to diversity, the networks contend there is no evidence that "the national ownership cap is needed to protect diversity" and that in any event § 202(h) does not allow the Commission to regulate broadcast ownership "in the name of diversity alone." The Commission, again supported by intervenors NAB and NASA, persuasively counters the statutory point: In the context of the regulation of broadcasting, "the public interest" has historically embraced diversity (as well as localism), *see FCC v. Nat. Citizens Comm. for Broad.,* 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978) (*NCCB*), and nothing in § 202(h) signals a departure from that historic scope. The question, therefore, is whether the Commission adequately justified its retention decision as necessary to further diversity or localism. In the *1998 Report* the Commission mentioned national diversity as a justification for retaining the NTSO Rule but never elaborated upon the point. *1998 Report* ¶ 26 n.78. This justification fails for two reasons. First, the Commission failed to explain why it was no longer adhering to the view it expressed in the *1984 Report* that national diversity is irrelevant. *1984 Report* ¶ ¶ 31–32. Second, the Commission's passing reference to national diversity does nothing to explain why the Rule is necessary to further that

end. The Commission did, however, discuss at some length fostering local diversity by strengthening the bargaining position of affiliates vis-a-vis their networks, *1998 Report* ¶ 30, a justification to which we shall come shortly.

As to the Commission's three more specific reasons for retaining the NTSO Rule, the networks contend that each is inadequate. The Commission stated that retaining the cap was necessary so it could: (1) observe the effects of recent changes in the rules governing local ownership of television stations; (2) observe the effects of the national ownership cap having been raised to 35%; and (3) preserve the power of local affiliates to bargain with their networks in order to promote diversity of programming. *1998 Report* ¶ ¶ 25–30. We agree with the networks that these reasons cannot justify the Commission's decision.

The first reason is insufficient because there is no obvious relationship between relaxation of the local ownership rule — which now permits a single entity to own two broadcast stations in the same market in some situations, *see Review of the Commission's Regulations Governing Television Broadcasting,* Report & Order, 14 F.C.C.R. 12903, ¶ 64, 1999 WL 591820 (1999) — and retention of the national ownership cap, and the Commission does nothing to suggest there is any non-obvious relationship. Furthermore, as the networks point out, neither the first nor the second reason is responsive to § 202(h): The Commission's wait-and-see approach cannot be squared with its statutory mandate promptly — that is, by revisiting the matter biennially — to "repeal or modify" any rule that is not "necessary in the public interest."

The Commission, with the support of intervenors NAB and NASA, argues that

it was required to defer to the decision of the Congress to set the initial ownership cap in the 1996 Act at 35%. For this the Commission relies upon both the House and the Senate having rejected a proposal to raise the cap to 50%, and upon the statement of Congressman Markey, ranking minority Member of the relevant subcommittee of the House, that the Congress's choice of the 35% cap "should settle the issue for many years to come." 142 Cong. Rec. H1145–06, H1170 (daily ed. Feb. 1, 1996). This legislative history is no basis whatever for the Commission's decision. First, the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change. Section 202(h) itself requires the Commission to determine whether its ownership rules — specifically including "rules adopted pursuant to this section," such as the present NTSO Rule — are necessary in the public interest. Thus, the statute imposed upon the Commission a duty to examine critically the new 35% NTSO Rule and to retain it only if it continued to be necessary; for the Commission to defer to the Congress's choice of 35% as of 1996 is to default upon this ongoing duty. Second, "the remarks of a single legislator, even the sponsor," cannot be allowed to alter the plain meaning of the legislation upon which he comments. *Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). In this instance, moreover, the congressman did not even purport to interpret the statute; he merely offered his own prediction that competitive conditions would not warrant a change in the Rule anytime soon. Maybe yes, maybe no. The statute says that is for the Commission to decide. Consequently, the first two reasons given by the Commission do nothing to support its decision.

Nor does the Commission's third reason — that the Rule is necessary to strengthen the bargaining power of network affiliates and thereby to promote diversity of programming — have sufficient support in the present record. Although we do not agree with the networks that this reason is unresponsive to § 202(h) — as we have said, that section allows the Commission to retain a rule necessary to safeguard the public interest in diversity — we must agree that the Commission's failure to address itself to the contrary views it expressed in the *1984 Report* effectively undermines its present rationale. In the *1998 Report* (¶ 30) the Commission asserted that independently-owned affiliates play a valuable role by "counterbalancing" the networks' strong economic incentive in clearing all network programming "because they have the right . . . to air instead" programming more responsive to local concerns. In the *1984 Report,* however, the Commission said it had "no evidence indicating that stations which are not group-owned better respond to community needs, or expend proportionately more of their revenues on local programming." *1984 Report* ¶ 53. The later decision does not indicate the Commission has since received such evidence or otherwise found reason to repudiate its prior conclusion.

In sum, we agree with the networks that the Commission has adduced not a single valid reason to believe the NTSO Rule is necessary in the public interest, either to safeguard competition or to enhance diversity. Although we agree with the Commission that protecting diversity is a permissible policy, the Commission did not provide an adequate basis for believing the Rule would in fact further that cause. We conclude, therefore, that the 1998 decision

to retain the NTSO Rule was arbitrary and capricious in violation of the APA.

■ *Other Commission actions.* The networks argue that the Commission's decision is also arbitrary and capricious because it is inconsistent with recent Commission decisions relaxing the local television station ownership and the radio/television cross-ownership rules, as well as its decisions repealing the prime time access and the financial and syndication rules. The Commission answers that it has properly followed the lead of the Congress in taking an "incremental" approach to the deregulation of broadcast ownership. Although we are not convinced the Congress required such an approach — the mandate of § 202(h) might better be likened to Farragut's order at the battle of Mobile Bay ("Damn the torpedoes! Full speed ahead.") than to the wait-and-see attitude of the Commission — because the decisions to which the networks point deal with regulations that are not closely related, analytically, to the NTSO Rule, they are not inconsistent with the Commission's decision to retain the national ownership cap.

## 2. Failure to comply with § 202(h)

■ The networks argue that the Commission's decision to retain the NTSO Rule was not only arbitrary and capricious but also contrary to § 202(h). As just discussed, we agree with the networks that two of the reasons the Commission gave for retaining the Rule did not even purport to show the Rule was necessary in the public interest, as required by the statute. Furthermore, we agree that the Commission "provided no analysis of the state of competition in the television industry to justify its decision to retain the national ownership cap." The Commission's brief description of the broadcasting market, a single paragraph of the *1998 Report* under the heading "Status of Media Marketplace," is woefully inadequate: The Commission merely listed the number of television households, the number of television stations, the percentage of those stations that are affiliated with networks, and the number of stations an average viewer can receive, without defining the relevant markets, let alone assessing the state of competition therein. *See 1998 Report* ¶ 9. Nor did the Commission attempt to link the listed facts to its decision to retain the national ownership cap. That, however, is precisely what § 202(h) requires. Consequently, we agree with the networks that the Commission "failed even to address meaningfully the question that Congress required it to answer."

## 3. Failure to address the *1984 Report*

■ The Commission's failure to address its *1984 Report* in the course of its contrary *1998 Report* is yet another way in which the decision to retain the NTSO Rule was arbitrary and capricious. Recall that in the *1984 Report* the Commission concluded the NTSO Rule should be repealed because it focuses upon national rather than local markets and because even then any need for the Rule had been undermined by competition. *1984 Report* ¶ 108. Indeed, even when the Commission subsequently reconsidered its decision to eliminate the national ownership cap — as necessitated by the moratorium the Congress imposed upon implementing the *1984 Report* — it expressly re-affirmed the conclusions reached in the *Report*. *Amendment of Multiple Ownership Rules,* Mem. Op. & Order, 100 F.C.C.2d 74, ¶ 3, 1985 WL 260060 (1984). To retain the cap in 1998 without explanation of the change in the Commission's view is, therefore, to all appearances, simply arbitrary. The Commission may, of course, change its mind, but it must explain why it is reasonable to

do so. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis."); *Telecomm. Research and Action Ctr. v. FCC,* 801 F.2d 501, 518 (D.C.Cir.1986).

The Commission now argues that the refusal of the Congress to allow the agency to implement the *1984 Report* and its decision in the 1996 Act to retain an ownership cap rendered irrelevant the views the Commission expressed in the *1984 Report.* When the Congress in 1996 directed the Commission periodically to review the ownership cap, however, it did nothing to preclude the Commission from considering certain arguments in favor of repealing the cap — including the arguments the Commission had embraced in 1984. So long as the reasoning of the *1984 Report* stands unrebutted, the Commission has not fulfilled its obligation, upon changing its mind, to give a reasoned account of its decision.

In sum, we hold that the decision to retain the NTSO Rule was both arbitrary and capricious and contrary to § 202(h) of the 1996 Act. The networks argue that this requires us to vacate the Rule rather than merely to remand the case to the agency for further consideration. As will be discussed below, we disagree, and for this reason we must go on to consider the networks' first amendment challenge to the NTSO Rule which, if successful, without question would require that the Rule be vacated.

### B. The First Amendment

The networks contend that the NTSO Rule violates the First Amendment because it prevents them from speaking di-rectly — that is, through stations they own and operate — to 65% of the potential television audience in the United States. They would have the court subject the Rule to "intermediate scrutiny," rather than to rationality review, on the grounds that: (a) in today's populous media marketplace the "scarcity" rationale associated with *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) — but in fact, we note, first set forth in *National Broadcasting Co. v. United States,* 319 U.S. 190, 226–27, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943) (*NBC*) — "makes no sense" as a reason for regulating ownership; (b) even if scarcity is still a valid concern, the NTSO Rule, which does not prevent an entity from owning more than one station in the same local market, does nothing to mitigate the effect of scarcity; and (c) *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), which postdates *Red Lion,* mandates heightened scrutiny for all restrictions on broadcast speech. In the alternative, the networks argue that even if the NTSO Rule is subject only to review for mere rationality — the least demanding type of first amendment scrutiny — then it is still unconstitutional because it "severely restricts [their] free speech rights and fails to advance any countervailing public interest."

█ The Commission urges the court to accord the NTSO Rule more deference than is accorded under intermediate scrutiny on the ground that the Supreme Court upheld similar ownership rules in *NCCB* and *NBC* upon determining they were merely reasonable. Just so.

In *NCCB* the court upheld the newspaper/broadcast crossownership rule stating: "The regulations are a reasonable means of promoting the public interest in diversified mass communications; thus they do not violate the First Amendment rights of

those who will be denied broadcast licenses pursuant to them." 436 U.S. at 802, 98 S.Ct. at 2115. In *NBC* the court upheld a regulation that prohibited a network from owning more than one radio station in a market and from owning any station in a market with few stations. 319 U.S. at 206–08, 63 S.Ct. at 1005–06. As in *NCCB*, the Court in *NBC* held the regulation to be consistent with the First Amendment because it was based upon network practices deemed contrary to the public interest and not upon the applicants' "political, economic or social views, or upon any other capricious basis." *Id.* at 226–27, 63 S.Ct. at 1014.

■ The networks offer no convincing reason those cases should not control. First, contrary to the implication of the networks' argument, this court is not in a position to reject the scarcity rationale even if we agree that it no longer makes sense. The Supreme Court has already heard the empirical case against that rationale and still "declined to question its continuing validity." *Turner I*, 512 U.S. 622, 638, 114 S.Ct. 2445, 2457, 129 L.Ed.2d 497 (1994). In any event, it is not the province of this court to determine when a prior decision of the Supreme Court has outlived its usefulness. *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997).

Second, contrary to the networks' express protestations, the scarcity rationale is implicated in this case. The scarcity rationale is based upon the limited physical capacity of the broadcast spectrum, which limited capacity means that "there are more would-be broadcasters than frequencies available." *Turner I*, 512 U.S. at 637, 114 S.Ct. at 2456. In the face of this limitation, the national ownership cap increases the number of different voices heard in the nation (albeit not the number heard in any one market). But for the

scarcity rationale, that increase would be of no moment.

Third, we do not think *League of Women Voters* mandates heightened scrutiny in this case. That case involved a prohibition upon editorializing by noncommercial broadcasters that received government money under the Public Broadcasting Act, which prohibition the Court concluded was a content-based restriction upon speech. 468 U.S. at 383–84, 104 S.Ct. at 3119–20. The Court applied heightened scrutiny, noting that restrictions placed upon broadcasters in order to "secure the public's First Amendment interest in receiving a balanced presentation of views on diverse matters of public concern," such as the fairness doctrine at issue in *Red Lion*, 395 U.S. at 386, 89 S.Ct. at 1804, "have been upheld only when we were satisfied that the restriction is narrowly tailored to further a substantial government interest." 468 U.S. at 380, 104 S.Ct. at 3117. The Court did not question, however, the continued propriety of deferential scrutiny of structural regulations. *Id.* The NTSO Rule, unlike the ban upon editorializing at issue in *League of Women Voters*, is not a content-based regulation; it is a regulation of industry structure, like the newspaper/broadcast cross-ownership rule the Court concluded was content-neutral in *NCCB*, and like the network ownership restriction upheld in *NBC*. *See NCCB*, 436 U.S. at 801, 98 S.Ct. at 2115; *NBC*, 319 U.S. at 226–27, 63 S.Ct. at 1014. For these reasons, the deferential review undertaken by the Supreme Court in *NCCB* and *NBC* is also appropriate here.

■ The networks, drawing directly upon the Commission's *1984 Report*, argue that the Rule fails even rationality review because "[p]ermitting one entity to own many stations can foster ... more programming preferred by consumers." They also suggest that but for the Rule

"buyers with superior skills [could] purchase stations where they may be able to do a better job" of meeting local needs even as they realize economies of scale.

This paean to the undoubted virtues of a free market in television stations is not, however, responsive to the question whether the Congress could reasonably determine that a more diversified ownership of television stations would likely lead to the presentation of more diverse points of view. By limiting the number of stations each network (or other entity) may own, the NTSO Rule ensures that there are more owners than there would otherwise be. An industry with a larger number of owners may well be less efficient than a more concentrated industry. Both consumer satisfaction and potential operating cost savings may be sacrificed as a result of the Rule. But that is not to say the Rule is unreasonable because the Congress may, in the regulation of broadcasting, constitutionally pursue values other than efficiency — including in particular diversity in programming, for which diversity of ownership is perhaps an aspirational but surely not an irrational proxy. Simply put, it is not unreasonable — and therefore not unconstitutional — for the Congress to prefer having in the aggregate more voices heard, each in roughly one-third of the nation, even if the number of voices heard in any given market remains the same.

## C. Remedy

We have concluded that, although the NTSO Rule is not unconstitutional, the Commission's decision to retain it was arbitrary and capricious and contrary to law because the Commission failed to give an adequate reason for its decision, failed to comply with § 202(h), and failed to explain its departure from its previously expressed views. Now we must determine the appropriate remedy.

The networks ask us to vacate the Rule, relying upon this court's opinion in *Radio-Television News Directors Ass'n v. FCC*, 229 F.3d 269 (2000) (*RTNDA II*). *See also Radio-Television News Directors Ass'n v. FCC*, 184 F.3d 872, 888 n. 21 (D.C.Cir. 1999) (*RTNDA I*) (holding open possibility court could vacate political editorial and personal attack rules after deciding Commission, which had proposed to repeal them, had inadequately justified decision not to do so). The Commission, supported by the intervenors, argue that the petitioners are entitled only to an order requiring the Commission to "conduct a rule making proceeding, which might or might no[t] result in repeal of the rules...."

█ Under the APA reviewing courts generally limit themselves to remanding for further consideration an agency order wanting an explanation adequate to sustain it. Thus, when an agency arbitrarily and capriciously denies a petition for rulemaking the proper remedy is typically to remand the case for reconsideration. *See, e.g., Geller v. FCC*, 610 F.2d 973, 980 (D.C.Cir.1979) (vacating denial of petition for rulemaking to repeal cable television rules and remanding for reconsideration). The case upon which the networks rely involved extraordinary circumstances — extreme delay and non-responsiveness by the Commission — that ultimately caused the court to issue a writ of mandamus. *RTNDA II*, 229 F.3d at 272; *see also Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 7 (D.C.Cir.1987) (explaining that remand with instructions to institute rulemaking is appropriate "only in the rarest and most compelling of circumstances"). In the present case, however, the agency appears to have been more errant than recalcitrant. At the same time, the Commission's argument that the court should limit

itself to setting aside the decision found to be deficient overlooks the relevance of § 202(h).

 Although a decision under § 202(h) to retain a rule is similar to an agency's denial of a petition for rulemaking, the underlying procedures differ in at least one important respect that requires a different approach upon judicial review: Section 202(h) carries with it a presumption in favor of repealing or modifying the ownership rules. Under § 202(h) the Commission may retain a rule only if it reasonably determines that the rule is "necessary in the public interest." If the reviewing court lacked the power to require the Commission to vacate a rule it had improperly retained and could require the Commission only to reconsider its decision, then the presumption in § 202(h) would lose much of its bite. It is not surprising, therefore, that counsel for the Commission conceded at oral argument that the court has the power to vacate — technically, to order the Commission to vacate — the ownership rules. For this reason, we conclude that vacatur is one remedy available to redress a violation of § 202(h).

 At the same time, it is clear that § 202(h) should not be read to require the court always to vacate a rule improperly retained by the Commission. After all, vacatur is not necessarily indicated even if an agency acts arbitrarily and capriciously in promulgating a rule. *United States Telecom Ass'n v. FBI*, 276 F.3d 620, 2002 WL 63087, *7 (D.C.Cir.2002); *Ill. Pub. Telecomm. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C.Cir.1997). The question is one of degree; as we said in *Allied-Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C.Cir.1993): "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* at 150–51. Although here we are reviewing an order declining to institute a rulemaking rather than an order promulgating a rule, we think the *Allied-Signal* test remains appropriate. Indeed, the situation at hand is procedurally similar to that we faced in *RTNDA I*, where we applied the *Allied-Signal* test. 184 F.3d at 887–89.

 Applying that test we conclude the NTSO Rule should not be vacated. Although the Commission's decision to retain the Rule was, as written, arbitrary and capricious and contrary to § 202(h), we cannot say with confidence that the Rule is likely irredeemable because the Commission failed to set forth the reasons — either analytical or empirical — for which it no longer adheres to the conclusions in its *1984 Report*. We do not infer from this silence that the agency cannot justify its change of position, for the Commission apparently labored under the misapprehension of law that the Congress, by blocking implementation of the *1984 Report*, had relieved the Commission from further concern with the analysis therein. If the Commission rested its decision upon the erroneous premise that the Congress had made its *1984 Report* irrelevant, then having been disabused the Commission may yet conclude the Rule is necessary to promote diversity at the local or the national level. To reach these conclusions, of course, the Commission would have to state the reason(s) for which it believes its contrary views set out in the *1984 Report* were incorrect or are inapplicable in the light of changed circumstances, but that is by no means inconceivable; the *Report* is, after all, now almost 20 years old. For this reason alone, a remand rather than vacatur is indicated. Moreover, we note that although the Com-

mission, in its *1998 Report,* failed to develop any affirmative justification for the Rule based upon competitive concerns, it did, albeit somewhat cryptically, advert to possible competitive problems in the national markets for advertising and program production, *1998 Report* ¶ 26 n.78; and intervenors NAB and NASA make a plausible argument that the NTSO Rule indeed furthers competition in the national television advertising market. The Commission needs either to develop or to jettison these points on remand. In sum, we cannot say it is unlikely the Commission will be able to justify a future decision to retain the Rule.

In these circumstances, the other factor to be considered under *Allied-Signal* — the disruption that might be caused if the court were now to vacate the Rule and the agency were later to re-promulgate it with an adequate explanation — is only barely relevant. It does not appear to us that there would be a significant disruption of the agency's regulatory program — contrast *Allied-Signal,* 988 F.2d at 151, where the agency would have had to pay refunds and could not have regulated retroactively — because the Commission presumably could require an entity to divest any station it acquired, at peril of being in violation of a newly promulgated ownership cap. *Cf. NCCB,* 436 U.S. at 802, 98 S.Ct. at 2116 (upholding Commission's decision, upon promulgation of newspaper/broadcast cross-ownership rule, to require divestiture in some markets where ownership concentration was particularly high). At the same time, if the Commission is right about the NTSO Rule, vacating it would for a time deprive some viewers of some diversity in the points of view available on the airwaves. *See Davis County Solid Waste Mgm't v. EPA,* 108 F.3d 1454, 1458–59 (D.C.Cir.1997) (considering harm to environment that vacatur of emissions standards would impose). In the end, it appears that vacatur could cause some but not a great loss to the viewing public.

Upon consideration of both the *Allied-Signal* factors, we conclude that, though the disruptive consequences of vacatur might not be great, the probability that the Commission will be able to justify retaining the NTSO Rule is sufficiently high that vacatur of the Rule is not appropriate. *See United States Telecom Ass'n v. FBI,* 276 F.3d 620, 627 (focusing upon first factor of *Allied-Signal* test). We therefore remand this case to the Commission for further consideration whether to repeal or to modify the NTSO Rule.

## IV. The CBCO Rule

Time Warner's principal contention is that the CBCO Rule is an unconstitutional abridgment of its first amendment right to speak. Time Warner also argues that the Commission's decision to retain the Rule was arbitrary and capricious and contrary to § 202(h). Because we agree that the retention decision was arbitrary and capricious as well as contrary to § 202(h), and that this requires us to vacate the Rule, we do not reach Time Warner's first amendment claim.

### A. Section 202(h) and the APA

██ Time Warner raises a host of objections to the Commission's decision to retain the CBCO Rule. The Commission is largely unresponsive to these arguments; to the extent it is responsive, it is unpersuasive.

██ First, Time Warner argues that the Commission impermissibly justified retaining the Rule on a ground, namely that cable/broadcast combines might "discriminate against unaffiliated broadcasters in making cable-carriage decisions," different from the one it gave when it promulgated the Rule, namely, that "cable should be

protected" from acquisition by networks bent upon pre-empting new competition. The Commission does not respond but even so we think the argument is clearly without merit. Nothing in § 202(h) suggests the grounds upon which the Commission may conclude that a rule is necessary in the public interest are limited to the grounds upon which it adopted the rule in the first place.

 Next, Time Warner argues that the Commission applied too lenient a standard when it concluded only that the CBCO Rule "continues to serve the public interest," *1998 Report* ¶ 102, and not that it was "necessary" in the public interest. Again the Commission is silent, but this time we agree with Time Warner; the Commission appears to have applied too low a standard. The statute is clear that a regulation should be retained only insofar as it is necessary in, not merely consonant with, the public interest.

Finally, Time Warner attacks the specific reasons the Commission gave for retaining the Rule. All three reasons relate either to competition or to diversity, and we have grouped them below accordingly.

### 1. Competition

The Commission expressed concern that a cable operator that owns a broadcast station: (1) can "discriminate" against other broadcasters by offering cable/broadcast joint advertising sales and promotions; and (2) has an incentive not to carry, or to carry on undesirable channels, the broadcast signals — including the forthcoming digital signals — of competing stations. *1998 Report* ¶ ¶ 103–105. Addressing the first concern, Time Warner argues that the Commission failed both to explain why joint advertising rates constitute "discrimination — which is simply a pejorative way of referring to economies of scale and scope" — and to "point to sub-

stantial evidence that such 'discrimination' is a nonconjectural problem." Addressing the second concern (in part), Time Warner contends that refusals by cable operators to carry digital signals must not be a significant problem because the Commission has declined to impose must-carry rules for duplicate digital signals. *See Carriage of Digital Television Broadcast Signals,* First Report & Order and Further Notice of Proposed Rulemaking, 16 F.C.C.R. 2598, 2001 WL 55621 (2001). Both of Time Warner's points are plausible — indeed the first is quite persuasive — and we have no basis upon which to reject either inasmuch as the Commission does not respond to them.

Next, Time Warner gives four reasons for which the Commission's concern about discriminatory carriage of broadcast signals is unwarranted. First, must-carry provisions, *see* 47 U.S.C. §§ 534–535; 47 C.F.R. § 76.55 *et seq.,* already ensure that broadcast stations have access to cable systems; indeed, the Commission pointed to only one instance in which a cable operator denied carriage to a broadcast station (Univision). *See 1998 Report* ¶ 104. Second, competition from direct broadcast satellite (DBS) providers makes discrimination against competing stations unprofitable. Third, the Commission failed to explain why it departed from the position it took in the *1992 Report,* where it said that the CBCO Rule was not necessary to prevent carriage discrimination. Fourth, because a cable operator may lawfully be co-owned with a cable programmer or a network, the Rule does little to cure the alleged problem of cable operators having an incentive to discriminate against stations that air competing programming.

In response the Commission concedes it did not address Time Warner's second and third points — competition from DBS services and the contradiction of the *1992*

*Report*: "Since the Commission did not address any of these issues in the *1998 Report*, counsel for the Commission are not in a position to respond to Time Warner's claims concerning these issues." The same might have been said of Time Warner's fourth point. These failings alone require that we reverse as arbitrary and capricious the Commission's decision to retain the CBCO Rule. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (a decision is arbitrary and capricious if the agency fails "to consider an important aspect of the problem").

 The only argument to which the Commission does respond is that the Univision incident alone cannot justify retention of the Rule: The Commission first points to its predictive judgment that there would be more discrimination without the CBCO Rule and then, citing *Time Warner I*, 211 F.3d at 1322–23, points out that the availability of behavioral remedies does not necessarily preclude it from imposing a structural remedy. We acknowledge that the court should ordinarily defer to the Commission's predictive judgments, and we take the Commission's point about remedies. In this case, however, the Commission has not shown a substantial enough probability of discrimination to deem reasonable a prophylactic rule as broad as the cross-ownership ban, especially in light of the already extant conduct rules. A single incident since the must-carry rules were promulgated — and one that seems to have been dealt with adequately under those rules — is just not enough to suggest an otherwise significant problem held in check only by the CBCO Rule.

We conclude that the Commission has failed to justify its retention of the CBCO Rule as necessary to safeguard competition. The Commission failed to consider competition from DBS, to justify its change in position from the *1992 Report*, and to put forward any adequate reason for believing the Rule remains "necessary in the public interest."

### 2. Diversity

As for retaining the Rule in the interest of diversity, the Commission had this to say: "Cable/TV combinations ... would represent the consolidation of the only participants in the video market for local news and public affairs programming, and would therefore compromise diversity." *1998 Report* ¶ 107. Time Warner argues that this rationale is contrary to § 202(h), as well as arbitrary and capricious, for essentially three reasons.

First, Time Warner contends that § 202(h), by virtue of its exclusive concern with competition, plainly precludes consideration of diversity and that, in any event, it should be so interpreted in order to avoid the constitutional question raised by the burden the CBCO Rule places upon the company's right to speak. Second, Time Warner argues that the increase in the number of broadcast stations in each local market since the promulgation of the CBCO Rule in 1970 renders any marginal increase in diversity owing to the operation of the Rule too slight to justify retaining it. Finally, Time Warner asserts that the decision to retain the Rule cannot be reconciled with the *TV Ownership Order*, in which the Commission concluded that a single entity may own two local television stations as long as there are eight other stations in the market and one of the two stations coming under common ownership is not among the four most watched stations. *See Review of the Commission's Regulations Governing Television Broadcasting*, Report & Order, 14 F.C.C.R. 12903, ¶ 64, 1999 WL 591820 (1999).

**1052**

The Commission responds feebly. First, it does not address Time Warner's argument that diversity may not be considered under § 202(h), but that is of little moment because it adequately addressed essentially the same argument when it was presented by the networks in connection with the NTSO Rule: A rule may be retained if it is necessary "in the public interest"; it need not be necessary specifically to safeguard competition. Second, the Commission concedes that it decided to retain the Rule without considering the increase in the number of competing television stations since it had promulgated the Rule in 1970. The Commission gives no explanation for this omission, yet it is hard to imagine anything more relevant to the question whether the Rule is still necessary to further diversity.

Finally, the Commission makes no response to Time Warner's argument that the concern with diversity cannot support an across-the-board prohibition of cross-ownership in light of the Commission's conclusion in the *TV Ownership Order* that common ownership of two broadcast stations in the same local market need not unduly compromise diversity. The Commission does object that Time Warner failed to raise this argument before the agency, but it appears that Time Warner did what it could to bring the argument to the Commission's attention. The *TV Ownership Order* was issued in August, 1999, after the close of the comment period, but almost a year before the *1998 Report* was issued (in June, 2000). A few months thereafter Time Warner proffered supplemental comments raising this point but the Commission declined to consider them. *1998 Report* ¶ 100 n.257. For this reason, we find the Commission's forfeiture argument unpersuasive. Even if it was proper for the agency to refuse to accept the comments, however, it does not follow that the agency was free to ignore its own

recently issued *TV Ownership Order.* Yet the Commission made no attempt in the *1998 Report* and makes no attempt in its brief to harmonize its seemingly inconsistent decisions.

In sum, the Commission concedes it failed to consider the increased number of television stations now in operation, and it is clear that the Commission failed to reconcile the decision under review with the *TV Ownership Order* it had issued only shortly before. We conclude, therefore, that the Commission's diversity rationale for retaining the CBCO Rule is woefully inadequate.

B. Remedy

 The only question left is whether, as Time Warner requests, we should order the Commission to vacate the CBCO Rule itself — as opposed merely to reversing the Commission's decision not to initiate a proceeding to repeal the Rule and remanding the matter for further consideration by the agency. Again, this type of decision is governed by the test laid out in *Allied-Signal.* As discussed above, the Commission put forward justifications for retaining the NTSO Rule — furthering local diversity by strengthening the bargaining position of network affiliates and furthering national diversity — that we rejected principally because the Commission failed to address the contrary position it took in its *1984 Report.* We noted, however, that the Commission's failure to explain why it departed from the views it expressed in 1984 appears to have stemmed from an error of law and not necessarily from an inability to do so. In addition, the intervenors presented plausible reasons for thinking the NTSO Rule may be necessary to further competition. The same cannot be said with respect to the CBCO Rule. The Commission gave no reason to think it could adequately address its conclusions in

the *1992 Report* or in the *TV Ownership Order*. Rather, the Commission simply failed to respond to the objections put before it. Furthermore, neither the Commission nor the intervenors gave any plausible reason for believing the CBCO Rule is necessary to further competition. Although the Commission presumably made its best effort, the reasons it gave in the *1998 Report* for retaining the CBCO Rule were at best flimsy, and its half-hearted attempt to defend its decision in this court is but another indication that the CBCO Rule is a hopeless cause.

Nor does it appear that vacating the CBCO Rule will be disruptive of the agency's regulatory program. If the agency wants to re-promulgate the Rule and is able to justify doing so, it presumably can require any entity then in violation of the Rule to divest either its broadcast station or its cable system in any market where it owns both. *Cf. NCCB*, 436 U.S. at 802, 98 S.Ct. at 2115–16. Although viewers may, in the interim, experience some diminution of diversity, the loss would seemingly be no greater than the diminution attendant upon the combination of two broadcast stations in the same market, which combination the Commission recently sanctioned in the *TV Ownership Order*. In sum, vacating the Rule might cause some disruption, but we hardly think it could be substantial.

Because the probability that the Commission would be able to justify retaining the CBCO Rule is low and the disruption that vacatur will create is relatively insubstantial, we shall vacate the CBCO Rule.

## V. Conclusion

The decision of the Commission not to repeal or to modify the NTSO Rule is vacated and the question whether to retain the Rule is remanded to the Commission for further proceedings consistent with this opinion. This court's stay order of April 6, 2001 is vacated without prejudice to the petitioners' ability to seek a further stay from the Commission during the pendency of such proceedings. The decision of the Commission not to repeal or to modify the CBCO Rule is also vacated, and the Commission is directed to repeal the CBCO Rule forthwith.

*So ordered.*