**UNITED STATES TELECOM ASSOCIATION, Appellant,**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Appellees.**

No. 00–5386.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 12, 2001.

Decided Jan. 18, 2002.

A. Stephen Hut Jr. argued the cause for appellant. With him on the briefs were John H. Harwood II, Samir C. Jain, Lawrence E. Sarjeant, Linda L. Kent and John W. Hunter.

Anne Murphy, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were Kenneth L. Wainstein, U.S. Attorney, and Douglas N. Letter, Counsel, U.S. Department of Justice. Daniel L. Kaplan, Counsel, entered an appearance.

Before: GINSBURG, Chief Judge, HENDERSON, Circuit Judge, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

Electronic eavesdropping has historically proceeded on a basis of cooperation

between law enforcement authorities and telephone service providers. In 1970 Congress regularized the relationship somewhat by providing that a court order for electronic surveillance should, at the request of the officer applying for authority, direct the provider to furnish the applicant with the necessary "information, facilities and technical assistance." Act of July 29, 1970, Pub.L. No. 91–358, tit. II, § 211(b), 84 Stat. 654 (1970), codified at 18 U.S.C. § 2518(4). Because of rapid technological development since then, Congress in 1994 added further structure with the Communications Assistance for Law Enforcement Act ("CALEA" or the "Act"), 47 U.S.C. § 1001 et seq. (1994). (Each of the statute's sections has a number 899 lower than that of its codified equivalent in Title 47; for simplicity's sake we use only the latter.) The Act has requirements relating to both the "capability" of telephone service providers to intercept communications and their "capacity" to do so. In *United States Telecom Ass'n v. FCC*, 227 F.3d 450 (D.C.Cir.2000), we addressed "capability"; here we deal only with "capacity."

In very simplified form, CALEA sets up the following regime as to capacity, involving three key phases: (1) The Attorney General issues "notices" of what capacity is needed. The Attorney General in fact has delegated his duties to the FBI, and we henceforth refer to it exclusively. (2) Each carrier responds with a "statement" of the modifications any of its systems or services will need to provide the required capacity. (3) A carrier is deemed in compliance with the FBI's capacity notices, without having made the specified modifications, until the FBI agrees to reimburse the carrier for those modifications. We spell out the scheme in more detail below.

In 1998 the FBI issued a set of rules implementing the Act's capacity requirements. See Implementation of Section 104 [47 U.S.C. § 1003] of CALEA, 63 Fed. Reg. 12218 (March 12, 1998) ("Final Notice"). United States Telecom Association ("USTA"), a trade association of about 1400 telephone companies, sought relief in district court against various provisions of the rules. First, it argued that the FBI had erroneously defined the class of "modifications" for which carriers might be eligible for reimbursement. Second, it said that the FBI's concept of the required "notices" misread the statute in a variety of ways, each increasing the carriers' burdens and their risks of being found non-complaint. In an unpublished opinion the district court granted summary judgment in favor of the FBI on all issues.

Reviewing the grant of summary judgment de novo, see, e.g., *Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1466 (D.C.Cir.1990), we affirm the district court with respect to the reimbursement scheme, finding that the FBI correctly defined the "modifications" required to be reimbursed. On the other hand, finding error on the part of the FBI on each of the disputes about its notices, we reverse on those issues, with instructions to the district court to remand the case, in one instance vacating the challenged feature of the rules, in the others not.

\*       \*       \*

CALEA requires the FBI to issue a notice of both the "actual number" of interceptions and devices that it expects will be conducted and used "simultaneously" by October 25, 1998, § 1003(a)(1)(A), and the "maximum capacity" required to accommodate the surveillance that enforcement agencies "may conduct and simultaneously use" *after* that date, § 1003(a)(1)(B). Subject to a qualification relating to reimbursement of necessary modifications, service providers are required within three years after notice to have the capacity specified in § 1003(a)(1)(A) and the ability "expedi-

tiously" to expand to the "maximum capacity" specified in § 1003(a)(1)(B). See §§ 1003(b)(1), 1003(e). The FBI notice under § 1003(a)(1)(A) is to state

> the *actual number* of communication interceptions, pen registers, and trap and trace devices, *representing a portion of the maximum capacity set forth under subparagraph (B),* that the [FBI] estimates that [law enforcement authorities] may conduct and use *simultaneously.*

47 U.S.C. § 1003(a)(1)(A) (emphasis added). Pen registers are devices that record the telephone numbers dialed by the surveillance's subject; trap and trace devices record the telephone numbers of the subject's incoming calls.

Each of the carriers is required to respond to the notice of capacity requirements with a "statement" of "systems or services that do not have the [necessary] capacity." § 1003(d). The FBI reviews these statements and "may" agree to reimburse the carrier "for costs associated directly with modifications to attain" the capacity requirements. § 1003(e). Until the FBI agrees to reimburse the necessary modifications specified by a carrier, the carrier is considered in compliance. *Id.*

We address first the cost allocation issue, then the character of the notices to be issued by the FBI.

*     *     *

*Cost Allocation.* We start with the key statutory provisions. Section 1003(d) sets out the duty of the carrier to submit a statement responding to the FBI's notice, and § 1003(e) states the relationship between a carrier's compliance and the FBI's decision on what to reimburse:

> § 1003(d) Carrier statement
>
> Within 180 days after the publication by the [FBI] of a notice of capacity requirements pursuant to subsection (a) or (c) of this section, a telecommunications carrier shall submit to the [FBI] a statement identifying any of its systems

or services that do not have the capacity to accommodate simultaneously the number of interceptions, pen registers, and trap and trace devices set forth in the notice under such subsection.

> § 1003(e) Reimbursement required for compliance
>
> The [FBI] shall review the statements submitted under subsection (d) of this section and may, subject to the availability of appropriations, agree to reimburse a telecommunications carrier for costs directly associated with modifications to attain such capacity requirement that are determined to be reasonable in accordance with section 1008(e) of this title. Until the [FBI] agrees to reimburse such carrier for such modification, such carrier shall be considered to be in compliance with the capacity notices under subsection (a) or (c) of this section.

47 U.S.C. §§ 1003(d), (e).

■ The Final Notice provided for eligibility for reimbursement as follows:

> Capacity costs associated with any equipment, facilities or services deployed after the Carrier Statement period of 180 days following the effective date of this Final Notice of Capacity will not be eligible for reimbursement.

Final Notice, 63 Fed. Reg. at 12220–21. But the language is concededly different from the thought the FBI intended to convey. In fact, government counsel assured us at oral argument (with the full assent of USTA's counsel), that this sentence should really be read as if it also contained the material added in boldface:

> Capacity costs associated with any equipment, facilities or services deployed after the Carrier Statement period of 180 days following the effective date of this Final Notice of Capacity will not be eligible for reimbursement, **except costs for modifications the FBI**

**has agreed to compensate under § 1003(e).**

Thus, expenses incurred to add equipment—other than for modifications that the carrier specified in its "statement" and that the FBI in its discretion agreed to reimburse—are not reimbursable.

USTA objects that under the FBI's reading of § 1003(e), a carrier will have to pay for all capacity it adds in the future (except for the reimbursed "modifications"), even though the government will be able to help itself to part of the added capacity. As was developed at oral argument, this skews a carrier's incentives: rather than invest in capacity additions sized to accommodate not only its customers' prospective demand but also the government's future wishes, it will elect smaller expansions, anticipating that after the next FBI notice and carrier statement its equipment will require "modification" and thus government reimbursement. USTA further argues that we should not defer to the FBI's reading of the Act under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because the government has a sharp pecuniary interest in the outcome: under USTA's reading of the statute, the government would have to pay for its share of all new capacity that it uses.

■ Of course the issue of *Chevron* deference arises only if the statute doesn't plainly settle the issue. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (holding that if "Congress has directly spoken to the precise question at issue," the court "must give effect to the unambiguously expressed intent of Congress."). Here we find that the Act does so, and therefore need not resolve USTA's pecuniary-interest theory.

The only costs for which the Act provides any compensation are for "modifications" under § 1003(e). These "modifications" are necessarily to "systems or services" identified by the carrier in its § 1003(d) statement as "not hav[ing] the capacity" to accommodate the needs set out in an FBI notice under § 1003(a)(1). And those "systems and services" are necessarily systems and services *extant* at the time the carrier files its statement. In other words, eligibility for reimbursement extends only to modifications as needed to mend deficiencies set out in the carrier's § 1003(d) statement.

USTA claims to find support in the passage of § 1003(e) that states: "Until the [FBI] agrees to reimburse [a] carrier for [reasonable] modifications, such carrier shall be considered in compliance with the capacity notices." 47 U.S.C. § 1003(e). But the carrier's being "in compliance" appears to refer only to the modifications identified in the § 1003(d) statement, and says nothing with respect to the government's uncompensated use of capacity that a provider may add, on its own, after submitting its § 1003(d) statement.

USTA also points to CALEA's enforcement provision, prohibiting a court from issuing any enforcement orders that "require a telecommunications carrier to meet the Government's demand for interception ... to any extent in excess of the capacity for which the [FBI] has agreed to reimburse such [a] carrier." 47 U.S.C. § 1007(c)(1). But USTA's literal reading of this section is plainly unsound; even USTA does not think the section governs available capacity antedating the FBI's very first § 1003(a)(1) notice. The FBI's reading of the section is that it reinforces the "safe harbor" provided by § 1003(e)'s assurance to a carrier that it will not be out of compliance if law enforcement authorities demand capacity that the carrier's § 1003(d) statement has said was needed (until the FBI funds the additional capacity). As appellant's construction of

§ 1007(c)(1) is impossible on a literal basis and would require us to twist the meaning of § 1003(e) itself, we find it unconvincing.

USTA's remaining textual analysis contrasts the Act's language on capacity with its language on capability, which explicitly provides for compensation for modifications of equipment deployed before January 1, 1995 to accommodate law enforcement, § 1008(d), and none for equipment deployed thereafter. We fail to see how the distinction helps USTA. The capability provisions plainly differ substantially from those for capacity, but the contrast sheds no light on the proper interpretation of §§ 1003(d) & (e).

■ Finally, USTA makes reference to some legislative history it believes is supportive of its position. See Appellant's Br. at 20–21 (citing H.R. Rep No. 103–827, pt. 1, at 17, 20 (1994)). "But we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). See also *Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987); *In re Sinclair*, 870 F.2d 1340, 1342–43 (7th Cir.1989) (suggesting that legislative history should only be used to elucidate the meaning of the statutory text). Of course, legislative history may "shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." *Natural Resources Defense Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C.Cir.1995) (internal quotation marks and citation omitted). But in fact the force of appellant's claim turns on its selective quotation. The House Committee Report said:

> After the four year transition period, which may be extended an additional two years by order of the FCC, *industry will bear the cost of ensuring that new equipment and services meet the legislated requirements,* as defined by

standards and specifications promulgated by the industry itself.

> However, to the extent that industry must install additional capacity to meet law enforcement needs, the bill requires the government to pay all capacity costs from date of enactment, including all capacity costs incurred after the four year transition period....

H.R. Rep No. 103–827, pt. 1, at 16–17 (emphasis added).

Appellant ignores the first sentence and quotes the second. In fact, properly read even the second sentence does not help appellant, for it describes the statute simply as calling on the government to pay for "additional capacity" that "industry must install ... to meet law enforcement needs." Just so. Government must pay for "modifications" that it agrees to reimburse as specified in § 1003(e), but otherwise helps itself to capacity that is available.

Accordingly, we affirm the district court's grant of summary judgment for the government on USTA's cost recovery claim.

\* \* \*

■ The remaining issues relate to provisions dealing with how the FBI "notices" are to specify capacity requirements. Again USTA argues that the FBI should not enjoy *Chevron* deference because of its pecuniary interest. Again we need not address the pecuniary-interest issue, though for a different reason from the one previously given. Even *Chevron* deference requires that the agency position be reasonable, *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, and on none of the following issues is that standard met.

*"Expeditiously."* Recall that the Act distinguishes between the "actual numbers" of interceptions and equipment the FBI expects to be conducted and used

simultaneously by October 25, 1998, § 1003(a)(1)(A), and the "maximum capacity" required to accommodate surveillance thereafter, § 1003(a)(1)(B). Section 1003(b) gives this distinction operational significance. Section 1003(b)(1) requires carriers by a specified date to have the capacity [subject to § 1003(e)] to accommodate the § 1003(a)(1)(A) demands and the ability to "*expand*[]" to the subsection (B) "maximum capacity"; and § 1003(b)(2) requires each carrier to "ensure that it can accommodate *expeditiously*" an increase in demand up to the "maximum capacity."

■ The Final Notice implements these provisions by reading "expeditiously" to allow only five business days. Final Notice, 63 Fed. Reg. at 12219/1. The only rationale offered to support the five-day period is transparently off point. The FBI said the decision was "based on past practice as to the time typically involved under existing procedures used by law enforcement and telecommunications carriers to make technical interception arrangements." *Id.* This statement about "past practice" relates only to provisioning individual wiretaps upon request—a task quite different from that of increasing total wiretapping capacity.

Worse, unrebutted evidence in the record suggests that it would be impossible for carriers to install additional capacity in such a short time period. Unsurprisingly, ordering new hardware, securing its delivery, and then installing and testing it takes more than five days. See *id.* at 12235/1 (noting that seven commenters, including the trade association representing telecommunications equipment manufacturers, have described this time frame as unrealistic).

In effect, then, the FBI's interpretation of "expeditiously" de facto erases the statutory distinction between actual and maximum capacity, even though the statute plainly intends such a distinction and even

specifies that "actual" capacity should be "a portion of the maximum capacity set forth under subparagraph (B)." § 1003(a)(1)(A). We therefore find unreasonable and vacate this aspect of the Final Notice. See *RCA Global Communications, Inc. v. FCC,* 758 F.2d 722, 733 (D.C.Cir.1985) (rejecting agency's reading of a statute that "would deprive [the statutory provision] of all substantive effect").

*"Capacity"/"Number of,"* and *"Simultaneously."* Recall that § 1003(a)(1)(A) requires the FBI to give notice of

> the *actual number* of communication interceptions, pen registers, and trap and trace devices, representing a portion of the maximum capacity set forth under subparagraph (B), that the [FBI] estimates that [law enforcement authorities] may conduct and use *simultaneously.*

47 U.S.C. § 1003(a)(1)(A) (emphasis added). Subsection (B) similarly requires notice of the "maximum capacity" required to accommodate such interceptions, etc., again "simultaneously." The Final Notice insisted that these statements of "actual number" and "capacity" were properly in terms that drew no distinction between different types of interceptions (e.g., communications content versus mere pen registers), even though they differ heavily in their actual demands on capacity. Final Notice, 63 Fed. Reg. at 12235. And it treated interceptions as "simultaneous" if they occur on the same day, even though they may each only take moments and do not overlap in the least. *Id.* at 12225. USTA objects to both these decisions. And rightly so.

■ As to "capacity," the FBI acknowledged that different interceptions impose different demands on capacity; content interceptions might require up to five delivery channels because of multiple participants on a call, while others, such as pen

registers and trap and trace devices, typically use only a single channel. See *id.* at 12218, 12232–33. By way of justification it said that the only historical data it had access to did not directly reveal the information the carriers were after: the available average national ratio of content interceptions to pen registers and trap and trace devices was not "in any way representative of any specific geographic region." *Id.* at 12235. It also said that, in any event, "law enforcement … does not know the type(s) of surveillance that will be needed in the future." *Id.* at 12236.

■ As to simultaneity, the FBI insisted that its choice "was logical from a law enforcement perspective" because court orders approving wiretapping activities are phrased in terms of days, and as a result such data was all that was available. *Id.* at 12225/3, 12235/2.

The FBI's justifications of both decisions—ultimately claims of defects in existing data—render them unreasonable. See *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 969–70 (D.C.Cir.1999). Such complete throwing up of hands is inconsistent with the Bureau's extensive use of statistical projections elsewhere in implementing CALEA. In fact, all the interception numbers that the FBI gave are estimates. For instance, to determine the actual and maximum capacity requirements themselves, the FBI undertook to establish a historic baseline, and then used statistical techniques to extrapolate the baseline into the future. *Id.* at 12224–25; see also *id.* at 12226/3 (stating that in determining "growth factors," which require prediction of future capacity requirements, "statistical and analytical methods were applied to the historical interception information").

As to these portions of the Final Notice, we reverse the judgment of the district court, with instructions to remand the case to the agency for a more adequate expla-

nation. Because it is not so clear as in the case of the Bureau's interpretation of "expeditiously" that there are no defensible grounds for its conclusions, however, the district court should not vacate the FBI's resolutions of the "number of/capacity" and "simultaneously" issues. Compare *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm.*, 988 F.2d 146, 150–51 (D.C.Cir. 1993) ("The decision whether to vacate depends on the 'seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.' ").

\* \* \*

The judgment of the district court is affirmed and reversed as set forth above.

*So ordered.*