Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 16, 2003        Decided October 10, 2003

No. 02-5056

THE WILLIAMS COMPANIES AND
DYNEGY MIDSTREAM SERVICES, LIMITED PARTNERSHIP,
APPELLEES

v.

FEDERAL ENERGY REGULATORY COMMISSION,
APPELLANT

DEVON ENERGY CORPORATION, ET AL.,
APPELLEES

CHEVRON U.S.A. INC., ET AL.,
INTERVENORS

————

Consolidated with
02-5077, 02-5078, 02-5081, 02-5082, 02-5085, 02-5086

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Appeals from the United States District Court
for the District of Columbia
(No. 01cv01580)
(No. 01cv01624)
(No. 01cv01976)

————

*Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, argued the cause for appellant. With him on the briefs were *Cynthia A. Marlette*, General Counsel, and *Lona T. Perry*, Attorney.

*John W. Wilmer, Jr., James M. Costan*, and *T. Alana Deere* were on the briefs for appellees Producer Coalition and Independent Petroleum Association of America.

*Henry S. May, Jr.* argued the cause for appellees The Williams Companies, et al. With him on the brief were *Charles D. Tetrault, Daniel A. Petalas, Howard L. Nelson, Jay V. Allen, James T. McManus, Joseph S. Koury*, and *Mari M. Ramsey. Jeffrey G. DiSciullo* and *G. Mark Cook* entered appearances.

*Katherine B. Edwards, Thomas J. Eastment, Melissa E. Maxwell, Douglas W. Rasch, Charles J. McClees, Jr.*, and *Frederick T. Kolb* were on the briefs for intervenors Chevron U.S.A. Inc., et al.

Before: GINSBURG, *Chief Judge*, ROBERTS, *Circuit Judge,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: On April 10, 2000 the Federal Energy Regulatory Commission, exercising authority it claimed under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356, issued regulations affecting companies providing natural gas transportation service—including "gathering" service—in the Outer Continental Shelf. The regulations required the companies to periodically file information with FERC concerning their pricing and

service structures, thereby implementing FERC's view that the resulting transparency would enhance competitive and open access to gas transportation. Order No. 639, FERC Stats. & Regs. (CCH) ¶ 31,097, at 31,514 (April 10, 2000). On petitions for rehearing and clarification, the Commission essentially adhered to its initial decision. Order No. 639–A, FERC Stats. & Regs. (CCH) ¶ 31,103 (July 26, 2000). Several of the subject companies sought judicial relief from the orders, suing in federal district court because FERC's action was under OCSLA rather than the Natural Gas Act. Compare 43 U.S.C. § 1349 (providing jurisdiction in district court for most challenges to orders under OCSLA), with 15 U.S.C. § 717r (providing for circuit court review of FERC decisions under the Natural Gas Act). Gas producers who ship or expect to ship on the covered pipelines intervened.

On January 11, 2002 the district court granted the plaintiffs' motion for summary judgment, denied FERC's motion for dismissal, and denied the intervenors' motion for summary judgment. *Chevron U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 58–59 (D.D.C. 2002). It ruled among other things that OCSLA did not give the Commission the authority it claimed to establish a general open access regime on the Outer Continental Shelf. Of course the Natural Gas Act gives the Commission broad authority over pipelines transporting gas in interstate commerce, but § 1(b) of that act, 15 U.S.C. § 717(b), expressly withholds jurisdiction over gathering, see, e.g., *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365, 368 (5th Cir. 1997), which the Commission's new regulations explicitly covered.

FERC appealed, arguing that the court had interpreted FERC's OCSLA authority too narrowly. We affirm.

* * *

The case turns entirely on the meaning of certain provisions of OCSLA, 43 U.S.C. §§ 1331–1356. Congress initially adopted the statute in 1953 and amended it in 1978. Among other changes, the 1978 amendments amplified the pre-existing open access provisions and accounted for administra-

tive changes arising from the passage in 1977 of the Department of Energy Organization Act, 42 U.S.C. § 7171*ff.* In the latter category was the transfer of OCSLA responsibilities formerly exercised by the Interstate Commerce Commission to the Federal Energy Regulatory Commission, a new agency replacing the Federal Power Commission and located in the Department of Energy. The OCSLA sections relevant to this appeal are §§ 5(e) & (f), 43 U.S.C. §§ 1334(e) & (f), which we reprint below in full, with the critical text highlighted:

> (e) Pipeline rights-of-way; forfeiture of grant
>
> *Rights-of-way through the submerged lands of the outer Continental Shelf*, whether or not such lands are included in a lease maintained or issued pursuant to this subchapter, *may be granted by the Secretary for pipeline purposes for the transportation of oil, natural gas, sulphur, or other minerals,* [ ][1] *under such regulations and upon such conditions as may be prescribed by the Secretary,* or where appropriate the Secretary of Transportation, including (as provided by section 1347(b) of this title) assuring maximum environmental protection by utilization of the best available and safest technologies, including the safest practices for pipeline burial[,][2] *and upon the express condition that oil or gas pipelines shall transport or purchase without discrimination, oil or natural gas produced from submerged lands or outer*

---

[1] The current official text contains an "or" here, so that the statute states that rights-of-way can be granted "for pipeline purposes for the transportation of oil, natural gas, sulphur, or other minerals, or under such regulations and upon such conditions as may be prescribed by the Secretary . . . ." (emphasis added). The underscored "or" is not present in the 1953 version of the statute, 67 Stat. 462 (1953). As we can imagine no plausible interpretation with this wording, we take the insertion to have been a scrivener's error.

[2] Without the inserted comma, the nondiscrimination provisions appear to be a subset of the treatment of environmental practices. Again seeing no plausible interpretation under that reading, we suspect a scrivener's error.

*Continental Shelf lands in the vicinity of the pipelines in such proportionate amounts as the Federal Energy Regulatory Commission, in consultation with the Secretary of Energy, may, after a full hearing with due notice thereof to the interested parties, determine to be reasonable*, taking into account, among other things, conservation and the prevention of waste. Failure to comply with the provisions of this section or the regulations and conditions prescribed under this section shall be grounds for forfeiture of the grant in an appropriate judicial proceeding instituted by the United States in any United States district court having jurisdiction under the provisions of this subchapter.

(f) Competitive principles governing pipeline operation

(1) Except as provided in paragraph (2), *every permit, license, easement, right-of-way, or other grant of authority for the transportation by pipeline on or across the outer Continental Shelf of oil or gas shall require that the pipeline be operated in accordance with the following competitive principles*:

(A) *The pipeline must provide open and nondiscriminatory access* to both owner and nonowner shippers.

(B) Upon the specific request of one or more owner or nonowner shippers able to provide a guaranteed level of throughput, and on the condition that the shipper or shippers requesting such expansion shall be responsible for bearing their proportionate share of the costs and risks related thereto, *[FERC] may, upon finding, after a full hearing with due notice thereof to the interested parties, that such expansion is within technological limits and economic feasibility, order a subsequent expansion of throughput capacity of any pipeline* for which the permit, license, easement, right-of-way, or other grant of authority is approved or issued after September 18, 1978. This subpara[g]raph shall not apply to any

such grant of authority approved or issued for the Gulf of Mexico or the Santa Barbara Channel.

(2) *[FERC] may, by order or regulation, exempt from any or all of the requirements of paragraph (1) of this subsection any pipeline or class of pipelines which feeds into a facility where oil and gas are first collected or a facility where oil and gas are first separated, dehydrated, or otherwise processed.*

(3) *The Secretary of Energy and [FERC] shall consult with and give due consideration to the views of the Attorney General on specific conditions to be included in any permit, license, easement, right-of-way, or grant of authority in order to ensure that pipelines are operated in accordance with the competitive principles set forth in paragraph (1) of this subsection.* In preparing any such views, the Attorney General shall consult with the Federal Trade Commission.

(4) Nothing in this subsection shall be deemed to limit, abridge, or modify any authority of the United States under any other provision of law with respect to pipelines on or across the outer Continental Shelf.

OCSLA §§ 5(e) & (f), 43 U.S.C. §§ 1334(e) & (f).

* * *

The statutory language

The crux of § 1334(e) is to require the Secretary (of the Interior) to impose open access conditions in his or her issuance of rights-of-way through submerged lands of the Outer Continental Shelf. To help achieve the open access goal, § 1334(e) grants FERC a single power: to determine, along with the Secretary of Energy, the proportions of oil, gas, or other minerals that each member of any relevant group of pipelines may be required to transport or purchase pursuant to those conditions. The resulting orders appear to be what in ordinary oil and gas industry parlance are called "ratable take" orders. See Howard Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 613–14 (1981). In a

rhetorical device that it also uses with respect to § 1334(f), FERC likes to paraphrase subsection (e) in a way that completely omits the *means* selected by Congress to achieve non-discrimination on the Outer Continental Shelf. It argues before us, for example, that both (e) and (f) "require that gas service providers offer nondiscriminatory access on the OCS." Appellant's Initial Br. at 19. Not so. In fact the provision simply requires the Secretary of Interior to condition grants of rights-of-way on the holder's agreeing to non-discriminatory transportation duties. Without some explicit provision to the contrary (as exists for quantification of the ratable take duty), Congress presumably intended that enforcement would be at the hands of the obligee of the conditions, the Secretary of the Interior (or possibly other persons that the conditions might specify). Except as to ratable take orders, the language supports no such role for FERC.

Section 1334(f) similarly fails to provide FERC with a general power to enforce OCSLA's open access provisions. Subsection (f)(1) states that permits, licenses, easements, etc., granted to pipelines for transportation through the OCS, "shall require" the firms in question to operate their pipelines in accordance with the "following competitive principles," which it then sets forth in subparts (A) and (B). Obviously when FERC issues a license covered by § 1334(f), such as a certificate of convenience and necessity under § 7(c) of the Natural Gas Act for transportation of gas through the Outer Continental Shelf, 15 U.S.C. § 717f(c), it is to include terms meeting the requirements set out in § 1334(f)(1). Subsection (f)(3) recognizes FERC's role as licensor, directing FERC (as well as the Secretary of Energy) to consult with the Attorney General on the "specific conditions" to be imposed when crafting any "license," etc., governed by (f)(1). FERC, indeed, has not hesitated to impose such conditions. See *Tennessee Gas Pipeline Co. v. FERC*, 972 F.2d 376, 381 (D.C. Cir. 1992) (reviewing orders imposing conditions on pipelines operating in the OCS in respect to services within FERC's jurisdiction under the Natural Gas Act).

Section 1334(f)(1)(B) grants FERC narrow and specific authority similar to that supplied by subsection (e). It allows FERC, on application by shippers and after a hearing and suitable findings, to order a pipeline to *expand* the capacity of an OCS pipeline for which a permit, license, etc., "is approved or issued after September 18, 1978," the date of the 1978 amendment adding subsection (f) to OCSLA. Such a narrow (and reactive) grant of power cannot be read as creating general enforcement authority.

Nor is subsection (f)(2) of any use to FERC. It permits FERC to *exempt* from subsection (f)(1) any facility that first collects, separates, dehydrates, or processes gas. A provision allowing FERC to exempt a subset of facilities from (f)(1)'s competitive principles is plainly not an authorization for it to impose and enforce such principles over all facilities.

Finally, as we have seen, § 1334(f)(3) simply adds a consultation procedure to the way in which FERC is to go about its specification of open access requirements, under (f)(1), in licenses that it issues within the scope of authority provided elsewhere—most obviously § 7(c) of the Natural Gas Act.

### Legislative history and *Shell Oil Co. v. FERC*

The statutory language being of no help to FERC, even to create an ambiguity that might enable it to claim deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), the Commission makes the ritual turn to legislative history. While such history can be used to clarify congressional intent even when a statute is superficially unambiguous, the bar is high. See *U.S. Telecom Ass'n v. FBI*, 276 F.3d 620, 625 (D.C. Cir. 2002) (noting Supreme Court's observation in *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994), that "we do not resort to legislative history to cloud a statutory text that is clear"). FERC cites two items that are clearly inadequate to the task. First, it points to a House Report stating that § 1334(f) "is a reaffirmation and strengthening" of § 1334(e). H.R. Cong. Rep. No. 95–1474 at 87, reprinted at 1978 U.S.C.C.A.N. 1674, 1686. So? FERC lacks the authority under either section to constitute itself a general regulator of open access for oil and gas on the OCS, regardless of whether

the sections are read together or individually; there is no miraculous synergy here that can spin a sweeping power out of the narrow ones provided.

The second item is the following colloquy between Senators Johnston and Kennedy:

> Mr. Johnston: These regulations [OCSLA] would be promulgated and run by the Secretary of the Interior, would they not, and not by the ICC? If so, do we not then have bifurcation of regulatory authority here which can only result in conflicts? Is that not true?
>
> Mr. Kennedy: . . . . Quite frankly, what I would see happening is that this would be boilerplate language in the leasing arrangements and that would be the most important part of the Interior's involvement, and the enforcement of that could be done by the ICC. . . . I think the enforcement *could* be done by the ICC. An arrangement could be worked out between the Energy Department and the ICC.
>
> Mr. Johnston: Certainly, the Secretary of the Interior is going to enforce his own regulations under this, is he not?
>
> Mr. Kennedy: *Yes*. He would enforce it, but in terms of working out the enforcement mechanism, it seems to me that something could be worked out. *The Secretary of the Interior is going to insure that these provisions are complied with*. Between the Department of the Interior and the ICC there can be an agreement on the implementation. We have a division of responsibility now between the Federal Trade Commission and the Antitrust Division for antitrust enforcement, just as we have other divisions of responsibilities between agencies. Obviously, these are matters that can be worked out.

123 Cong. Rec. S23,253 (daily ed. July 15, 1977) (emphasis added). FERC argues that this exchange demonstrates Senator Kennedy's desire that the ICC should be able to enforce the conditions that, under subsections (e) and (f), were to be included in OCS transportation permits, licenses, etc., by

agencies issuing such grants. (The ICC was in the end supplanted by FERC, an entity created *after* the colloquy and then substituted for the ICC in a later amendment to the OCSLA amendments as they worked their way through Congress.) As we have seen, FERC does issue such licenses, namely, certificates of convenience and necessity under § 7(c) of the Natural Gas Act, and doubtless enforces the attached conditions. The emphasized passage explicitly states Senator Kennedy's recognition that the Secretary of Interior would enforce the conditions in licenses issued by Interior; his suggestion about a theoretical "agreement on implementation" is too frail a basis for the statutory rewrite that FERC invites. What we said in an earlier case where a litigant invoked "bits and pieces of legislative history surrounding the 1978 Amendments to OCSLA" is equally true today: "[S]nippets of legislative history do not a law make." *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071, 1088 (D.C. Cir. 2002).

Finally, FERC argues that in *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1199–1200 (D.C. Cir. 1995), we have already upheld its broad reading of §§ 1334(e) & (f). In fact *Shell* is far narrower.

In *Shell*, FERC had ordered Pennzoil, operator of the "Bonito" pipeline in the OCS, to interconnect Bonito with Shell's pipeline and to carry its oil. All parties appear to have accepted the proposition that as a general matter FERC had authority to order such interconnections. After we rejected Pennzoil's claim that the order was really a capacity allocation order under subsection (e), and thus could occur only through *its* procedures, *id*. at 1198–99, we considered its argument that the Bonito order was really an *expansion* order under subsection (f)(1)(B) and thus subject to that provision's geographic limits (which excluded the Gulf of Mexico, where the Bonito lay). *Id*. at 1200. See also Pennzoil's Opening Br. at 42–43 in *Shell Oil Co. v. FERC*. Finding that the interconnection ordered by FERC was not "an expansion of throughput capacity," we rejected the claim. 47 F.3d at 1200. There the parties had not questioned FERC's

general authority to order open-access enhancing conduct on the OCS;  here they have.

* * *

Sections 5(e) and (f) of OCSLA do not grant FERC general powers to create and enforce open access rules on the OCS, but merely assign it a few well-defined tasks.  As FERC was without authority to issue the regulations at issue here, the judgment of the district court is

*Affirmed.*